IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:18-CV-222-FL

| | | |
|---|---|---|
| PAUL DILLON on behalf of himself and all similarly situated persons and entities, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | ORDER |
| THE LEAZER GROUP, INC. a North Carolina corporation; and BENNY ART LEAZER an individual and citizen of the State of North Carolina, | ) ) ) ) ) | |
| Defendants. | ) ) | |

This matter is before the court on defendants' motion to dismiss for failure to state a claim (DE 11). Plaintiff responded and defendants replied. In this posture, the issues raised are ripe for ruling. For the following reasons, defendants' motion is granted.

## STATEMENT OF THE CASE

Plaintiff commenced this action on February 20, 2018, in Wake County Superior Court arising out of his work as an insurance agent for defendant The Leazer Group, Inc. ("TLG"), a North Carolina corporation allegedly controlled by defendant Benny Art Leazer ("Leazer"). Plaintiff asserts claims under North Carolina law on behalf of himself and a proposed class of all similarly situated persons and entites who were also TLG agents, based upon breach of contract, fraud, negligent misrepresentation, negligence, unjust enrichment, unfair and deceptive trade practices and civil conspiracy. Plaintiff seeks compensatory damages, trebled damages, punitive damages,

declaratory judgment, class certification, jury trial, attorney's fees, costs, expenses, and interest. Plaintiff attaches to his complaint as Exhibit A an "Agent Agreement" that plaintiff allegedly executed with defendant TLG (hereinafter the "Agent Agreement" or the "agreement").

Defendants filed the instant motion to dismiss on June 29, 2018, asserting that all claims fail as a matter of law and should be dismissed pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6). The court stayed scheduling activities pending decision on the motion. Plaintiff responded in opposition on August 10, 2018, and defendants replied on August 24, 2018.

## STATEMENT OF FACTS

The facts alleged in the complaint may be summarized as follows. Plaintiff is a Tennessee resident. Defendant TLG "is an insurance marketing organization founded and controlled by [defendant Leazer] and specializing in mortgage protection insurance, burial insurance (also known as "final expense insurance"), annuities, and index universal life insurance." (Compl. ¶ 9).

According to plaintiff, "TLG is structured as a 'multi-level marketing' or 'pyramid selling' scheme, a . . . marketing strategy whereby TLG's revenue is obtained by hawking various products and services to a sales team comprised of independent insurance contractors," referenced in the complaint as "TLG Agents," "who are themselves contractually obligated to both purchase these products and services from TLG and to exclusively market and sell TLG's insurance products to retail customers." (Id. ¶¶ 11-12).

"TLG sells so-called 'leads' to TLG Agents," where the "leads contain the contact information for potential retail purchasers of the insurance products offered by TLG through TLG Agents." (Id. ¶ 15). "The insurance products themselves are sourced from third party insurance companies who have agreed to provide TLG and Leazer with the rights to market certain policies."

(Id.). According to plaintiff, "TLG erects a pyramid-type commission scheme for commission distribution," which is "created when one TLG Agent recruits a second TLG Agent," and the "second TLG Agent is then deemed 'down-line' from the first TLG Agent, and the first TLG Agent receives a portion of the commissions generated from the second TLG Agent's retail sales, as does TLG." (Id. ¶ 13). The process continues "so on down the line" as new agents are recruited. (Id.).

Plaintiff entered into an "Agent Agreement" with TLG, on or about March 23, 2016, in the position of "Independent Contractor" referenced in the agreement. (Id. ¶ 44; pp. 33-48)).[1] The Agent Agreement provides that "in consideration of (i) this contract to sell the products of the Contracted Insurance Companies through TLG's relationship with such companies . . . [ii] marketing incentives from time to time made available by the Contracted Insurance Companies through TLJ; (iii) access for a limited time to marketing tools and services and (iv) other good and valuable consideration, including but not limited to a one-time $100.00 credit toward each existing Independent Contractor's purchase of leads," the parties agree to certain terms and conditions set forth in the Agent Agreement. (Id. at 34).

Among those terms and conditions, "TLG has developed a lead program (the "Lead Program") to allow its associated insurance agents to buy leads from TLG in connection with the sale of insurance and recruiting insurance agents for TLJ Contracted Insurance Companies." (Id. at 34-35). Pertinent terms of the Lead Program in the agreement are as follows:

---

[1] In citations to the Agent Agreement, the court specifies the page number(s) of the document filed on the court's docket (e.g., DE 1-1 at 33), shown superimposed on the filed document in the court's Case Management / Electronic Case Filing (CM/ECF) system, and not the page number printed on the face of the original document (e.g., "1").

a. Request for Leads. The Independent Contractor's acceptance of the terms of this Agreement constitutes his/her request for TLG to supply Independent Contractor with leads at the rate assigned to the applicable commission level at the time of purchase of such leads.
b. Diligent Use of Leads. Independent Contractor agrees to use best efforts to work and solicit the number of leads requested on a weekly basis and to ensure that any leads provided to the Independent Contractor or Independent Contractor's down-line agents are diligently and legally solicited.

(Id. at 35).   As part of his obligations as an Independent Contractor under the agreement, plaintiff

agreed "that all leads provided to [him] or to [his] down-line agents must only be used (i) to sell

insurance or products authorized by TLG through TLG or TLG Contracted Insurance Companies

or (ii) to recruit insurance agents to sell insurance or products through TLG Contracted Insurance

Companies."  (Id.).  Provision of and payment for leads is further governed by the following:

d. TLG to Supply Leads. TLG, by itself or through its agents, contractors or assigns, agrees to use commercially reasonable efforts to make available to Independent Contractor leads on a weekly basis so long as such leads are available and Independent Contractor is in compliance with the terms of this Agreement.
e. Payment for Leads; Default.  Independent Contractor agrees to pay for each lead received by it (exclusive of any free leads that may be provided by TLG from time to time), including any associated charges assessed by TLG from time to time relating to the Lead Program, as detailed in invoices submitted by TLG. In the event of default on any obligation to pay TLG, Independent Contractor shall be responsible for and promptly pay (i) interest on the amount owed at the rate of one and one half percent (1.5%) per month or the highest legally permitted rate, whichever is lower; and (ii) TLG's costs of collecting such debt, including without limitation, reasonable attorneys' fees.

(Id.). In addition, plaintiff agreed "to pay all charges or costs for leads received by [his] down-line

agents, should such agents fail to pay for such lead costs."  (Id.)  He agreed "to guarantee payment

and performance of [his] down-line down-line agents . . . even if the down-line agent's obligations are discharged in bankruptcy." (<u>Id.</u> at 35-36). The agreement allowed plaintiff to "withdraw from the Lead Program with thirty (30) days prior written notice to TLG." (<u>Id.</u> at 36). It also allowed TLG to "terminate or suspend [plaintiff's] participation in the Lead Program upon written notice by TLG." (<u>Id.</u>).

As part of the agreement TLG agreed to provide plaintiff temporary access to TLG products, described as "tools, websites, products, services and incentives of TLG as are generally offered to all insurance agents associated with TLG." (<u>Id.</u> at 44). The agreement provided that plaintiff's access to TLG's products may cease when TLG notifies plaintiff in writing, and that plaintiff "may renew [his] access to the TLG products only" under conditions set forth in the agreement. (<u>Id.</u>). As part of the agreement, plaintiff also acknowledged he "is or will be one of many Independent Contractors associated with TLG." (<u>Id.</u> at 38). Plaintiff also acknowledged that the Agent Agreement "contains the entire Agreement of the parties with respect to the subject matter hereof." (<u>Id.</u> at 46).

Plaintiff alleges in the complaint that "in its marketing materials directed to Plaintiff and other prospective TLG Agents, TLG and Leazer promised 'fresh, high quality direct mail leads! [O]ur exclusive Mortgage Protection Platinum Direct Mail Lead program is unique and enables our agents to yield a much higher ROI (rate of return) on their marketing investments than other lead sources.'" (<u>Id.</u> ¶ 19). According to plaintiff, "TLG's leads are neither generated in-house nor proprietary." (<u>Id.</u>). "Rather, as is common in the industry, TLG and Leazer purchase leads from certain third-party vendors who specialize in selling leads to insurance agents." (<u>Id.</u> ¶ 20). "TLG and Leazer then re-sell these third-party leads to TLG Agents at an inflated price without informing

the TLG Agents that the leads they are purchasing were generated by a third party." (Id.). "TLG would typically purchase the leads from a third-party vendor with a 90-day term of exclusive use." (Id. ¶ 23). "TLG and Leazer do not disclose any of this information to the TLG Agents." (Id.).

In addition, "TLG and Leazer do not provide the TLG Agents with the dates that TLG purchased its leads from third-party vendors. Accordingly, TLG Agents have no way to know or assess how long they have exclusive use of any particular lead." (Id. ¶ 25). According to plaintiff, defendants knew "that if TLG Agents learned that the leads were sourced from third parties, they would purchase the leads from the third parties at a lower price rather than through TLG and Leazer at the inflated price." (Id.).

According to plaintiff, "TLG's leads are offered through a tiered purchasing system and pricing structure wherein leads are offered and priced based upon the age of leads," described as follows:

According to its published materials, TLG offers five levels of leads as follows:

- "PLATINUM LEADS – Our direct mail Platinum are our most exclusive leads and are highly sought after by all of our agents. A Platinum lead is a fresh direct mail lead that is uploaded into our lead management system within 24 hours of receipt. Agents have access to purchasing these leads 24/7 utilizing our state of the art lead management system, OPT.

- TLG GOLD LEADS – A Gold lead is simply a Platinum lead that has not been sold to an agent but is now reached an age of 90 days. The lead is then changed to a Gold lead with a discounted price to the agent.

- TLG B-1 LEADS – These are leads that were distributed 1x to another TLG agent but did not sell a policy within a 5 week exclusive period.

- TLG B-2 LEADS – These are leads that were distributed 1x to another TLG agent as a B1 lead and they did not sell a policy within a 5 week exclusive period or the leads were sold as a Platinum lead but never resold as a B1 lead,

then the lead will automatically become a B2 lead after 12 weeks from the date it was originally sold as a Platinum lead in OPT.

- TLG RW (Re-work) LEADS -- Leads that were never sold a policy and were distributed to another agent (non-TLG) and were generated 10-18 months prior to becoming an RW lead. These can be a great source of income for many agents who are working with limited budget as well who need to improve their phone and closing skills."

(Id. ¶ 28).

"In his role as a TLG Agent, [plaintiff] began purchasing leads from TLG in April 2016, as is required by the Agent Agreement." (Id. ¶ 57). Plaintiff "purchased Platinum leads from TLG and Leazer, typically at a price in excess of $40.00 per lead." (Id. ¶ 58). "Had [plaintiff] been informed by TLG and Leazer that the leads were purchased from third party vendors, that the leads were not proprietary, and that he did not have 90-days exclusive use, [plaintiff] would never have purchased leads from TLG and Leazer." (Id.). "Indeed, the market price for may such leads is as low as $3.00-$4.00." (Id. ¶ 58). "Dillon did not know any of this information at the time he purchased leads from TLG and Leazer." (Id.). Plaintiff describes his experience with certain leads he purchased as follows:

[In] attempting to make retail sales of TLG insurance products, Dillon discovered that many of the retail customers he contacted through the allegedly Platinum leads he purchased complained that he contacted them long after they filled out the form indicating that they were interested in purchasing insurance products. Dillon discovered that other TLG Agents had the same experience with allegedly Platinum leads.

In light of these complaints from retail customers, Dillon questioned the age of the allegedly Platinum leads to his up-line agents, Jerry Blackburn, Bill South, and Nicholas Horner, all of whom were higher up the pyramid from Dillon and recipients of commission overrides sourced from retail sales made by Dillon.

Each of Dillon's up-line agents accused the prospective retail customers of lying and flatly denied ever having similar problems themselves.

(Id. ¶¶ 59-61).

"Unconvinced, [plaintiff] raised the issue with TLG directly, who initially denied that any allegedly Platinum leads were older than 90 days." (Id. ¶ 62). Plaintiff "continued to pursue this issue with TLG, despite this initial denial." (Id.). "An in-house TLG manager reiterated this denial to [plaintiff] via telephone and email on several occasions before ceasing correspondence with him for several weeks." (Id.). "When correspondence resumed, TLG's in-house manager admitted that some of the allegedly Platinum leads were older than 90 days, though she refused to disclose with specificity which leads she was referring to." (Id. ¶ 63). "TLG refused to provide [plaintiff] with a full refund for the leads." (Id.). "Rather, TLG merely offered [plaintiff] a small credit for the purchase of future TLG leads." (Id.). Plaintiff "rejected this . . . offer." (Id.).

Shortly thereafter, "TLG and Leazer locked [plaintiff] out of all company websites and online agent support sites, despite the fact that Dillon had paid TLG and Leazer for these services. Likewise, Dillon was unable to access leads that he had already paid for and was not offered a refund or reimbursement for these leads." (Id. ¶ 67). "TLG and Leazer did so without providing [plaintiff] . . . written notice." (Id.). In addition, defendants changed plaintiff's "compensation rate from the industry standard 9-month commission advance, which is the compensation rate Leazer promises to LTG Agents when recruiting them to join TLG, to 'as earned,' meaning that [plaintiff] would receive commission on a monthly basis for any retail sales rather than receiving the first 9-months commission as a lump sum at the time the sale is processed." (Id. ¶ 68). Finally, defendants transferred plaintiff's "down-line TLG Agents to other TLG Agents, thereby . . . depriving [plaintiff] of . . . commission[s] from the retail sales of his down-line TLG Agents." (Id. ¶ 69). Defendants have not terminated plaintiff's Agent Agreement in writing. (Id. ¶ 70).

Additional allegations and assertions in the complaint will be addressed in the court's analysis.

## DISCUSSION

A.     Standard of Review

"To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). In evaluating whether a claim is stated, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . .

unwarranted inferences, unreasonable conclusions, or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009) (citations omitted).

B.    Analysis

    1.    Breach of Contract

Plaintiff claims that defendant TLG breached the Agent Agreement by failing to "use reasonable commercial efforts to supply leads" and by "misrepresenting and omitting to disclose the characteristics of the leads sold." (Compl. ¶ 112).

Under North Carolina law, a claim for breach of contract requires a plaintiff to allege "the existence of a contract between plaintiff and defendant, the specific provisions breached, [t]he facts constituting the breach, and the amount of damages resulting to plaintiff from such breach." Cantrell v. Woodhill Enterprises, Inc., 273 N.C. 490, 497 (1968). "Interpreting a contract requires the court to examine the language of the contract itself for indications of the parties' intent at the moment of execution." State v. Phillip Morris USA Inc., 323 N.C. 623, 631 (2009) (internal citation and quotation omitted). "It is the general law of contracts that the purport of a written instrument is to be gathered from its four corners, and the four corners are to be ascertained from the language used in the instrument." Carolina Power & Light Co. v. Bowman, 229 N.C. 682, 693-94 (1949). Terms in a contract are to be "interpreted according to their usual, ordinary, and commonly accepted meaning." Anderson v. Allstate Ins. Co., 266 N.C. 309, 312 (1966). "Where the terms of the contract are not ambiguous, the express language of the contract controls in determining its meaning and not what either party thought the agreement to be." Crockett v. First Fed. Sav. & Loan Ass'n, 289 N.C. 620, 631 (1976).

Here, with respect to the first asserted breach by TLG, plaintiff has not alleged facts constituting the breach. The Agent Agreement requires defendant TLG "to use commercially reasonable efforts to make available to [plaintiff] leads on a weekly basis so long as such leads are available and [plaintiff] is in compliance with the terms of this Agreement." (Compl. at 35). Plaintiff does not allege facts permitting an inference that defendant failed to comply with this provision. To the contrary, the complaint states that defendant TLG "offers five levels of leads" "through a tiered purchasing system," and plaintiff "began purchasing leads from TLG in April 2016" (Id. ¶¶ 26-27, 57). Accordingly, plaintiff fails to state a claim for breach of contract based upon failure to use reasonable commercial efforts to supply leads.

With respect to the second asserted breach by TLG, plaintiff has not shown that the Agent Agreement required defendant TLG to act as he asserts. Plaintiff contends that defendant "misrepresent[ed]" and "omitt[ed] to disclose the characteristics of the leads sold." (Compl. ¶ 112). But, the Agent Agreement does not specify the characteristics of the leads sold, nor does it require TLG to disclose the characteristics of the leads sold. (See id. at 35). It only requires "TLG to Supply Leads" and requires plaintiff "to pay for each lead received by" him. (Id.). With respect to rates, it provides that plaintiff's "acceptance of the terms of this Agreement constitutes [his] request for TLG to supply [him] with leads at the rate assigned to the applicable commission level at the time of purchase of such leads." (Id. (emphasis added)). While plaintiff suggests that the leads plaintiff purchased were not of the value or quality that he expected, the Agent Agreement does not guarantee any particular results from leads.

Plaintiff argues that a duty of good faith and fair dealing "provides the missing terms of the agreement that necessarily flow from the parties' intentions," thus requiring defendant TLG to

provide plaintiff with certain characteristics of lead as reflected in "defendants' representations of its products." (Pl's Resp. (DE 15) at 25-26; see Compl. ¶ 113). The law, however, does not permit plaintiff to supply a missing term in the manner plaintiff asserts. "In every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement." Bicycle Transit Auth., Inc. v. Bell, 314 N.C. 219, 228 (1985). "It is a basic principle of contract law that a party who enters into an enforceable contract is required to act in good faith and to make reasonable efforts to perform his obligations under the agreement." Weyerhaeuser Co. v. Godwin Bldg. Supply Co., 40 N.C. App. 743, 746 (1979). However, an asserted implied term cannot be used to contradict the express terms of a contract. See Vetco Concrete Co. v. Troy Lumber Co., 256 N.C. 709, 713 (1962) ("[A]n express contract precludes an implied contract with reference to the same matter.").

Here, the Agent Agreement constitutes the entire agreement between the parties regarding the terms and conditions under which plaintiff purchases and defendant TLG supplies leads. (Compl. at 46). Under North Carolina law, the intent of the parties flows from the terms contained within the four corners of the agreement, and plaintiff cannot supply additional terms by reference to unincorporated promises made outside of the agreement. See Bowman, 229 N.C. at 693-94; Crockett, 289 N.C. at 631. Thus, where the Agent Agreement expressly obligates defendant TLG only to supply "leads" without guaranteeing a particular characteristic or result of the leads supplied, (Compl. at 35), the duty of good faith and fair dealing cannot be used to superimpose more restrictive and onerous terms upon defendant TLG.

Plaintiff cites to an unpublished case, Performance Sales & Mktg., LLC v. Lowe's Companies, Inc., No. 5:07CV140, 2010 WL 2294323, at *10 (W.D.N.C. June 4, 2010), for the

proposition that "the duty of good faith provides the missing terms of the agreement that necessarily flow from the parties' intentions, thus allowing enforcement of the contract." <u>Id.</u> (citing <u>Ultra Innovations, Inc. v. Food Lion, Inc.</u>, 502 S.E.2d 685, 687 (N.C.Ct.App.1998)). The cited language, however, highlights the flaw in plaintiff's argument, where it allows provision of missing terms that "<u>necessarily flow</u> from the parties' intentions." <u>Id.</u> (emphasis added). Here, the terms and characteristics of leads that plaintiff asserts in his breach of contract claim do not necessarily flow from the parties' intentions as set forth by the plain language within the four corners of the Agent Agreement. Moreover, <u>Performance Sales</u> is inapposite because, there, the plaintiff "did not allege that the duty of good faith in [that] case had any source other than the contracts between the parties," <u>id.</u> at *11, whereas here plaintiff alleges a duty of good faith based upon promises made prior to entry into the agreement. (Pl's Mem. (DE 15) at 15).

In sum, plaintiff fails to state a claim for breach of contract. Therefore, plaintiff's breach of contract claim must be dismissed without prejudice.

2.      Tort Claims

Plaintiff asserts tort claims of fraud, negligent misrepresentation, negligence, unfair and deceptive trade practices under the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"), and civil conspiracy. Defendants seek dismissal of plaintiff's tort claims on the basis that they are barred by the North Carolina economic loss rule, and on the basis that plaintiff has failed to plead the claims with requisite specificity.

a.      Economic Loss Rule

"North Carolina's economic loss rule provides that 'ordinarily, a breach of contract does not give rise to a tort action by the promisee against the promisor.'" Legacy Data Access, Inc. v. Cadrillion, LLC, 889 F.3d 158, 164 (4th Cir. 2018) (quoting N.Carolina State Ports Auth. v. Lloyd A. Fry Roofing Co., 294 N.C. 73, 240 S.E.2d 345, 350 (1978) ). Under this rule, a "tort action does not lie against a party to a contract who simply fails to properly perform the terms of the contract." Id. (quotations omitted). "It is the law of contract, not tort law, which defines the obligations and remedies of the parties in such a situation." Id. (quotations omitted). "Accordingly, North Carolina law requires' courts to limit plaintiffs' tort claims to only those claims which are identifiable and distinct from the primary breach of contract claim." Id. (quoting Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 346 (4th Cir. 1998)). "Only where a breach of contract also constitutes an 'independent tort' may tort actions be pursued." Strum v. Exxon Co., U.S.A., a Div. of Exxon Corp., 15 F.3d 327, 330 (4th Cir. 1994).

Furthermore, it is "unlikely that an independent tort could arise in the course of contractual performance, since those sorts of claims are most appropriately addressed by asking simply whether a party adequately fulfilled its contractual obligations." Id.; see N. Carolina State Ports Auth., 294 N.C. at 83 ("[O]ur research has brought to our attention no case in which this Court has held a tort action lies against a promisor for his simple failure to perform his contract, even though such failure was due to negligence or lack of skill."); Hancock v. Americo Fin. Life & Annuity Ins. Co., 272 F. Supp. 3d 763, 777 (E.D.N.C. 2017) (dismissing North Carolina "tort claims . . . based upon the alleged concealment by defendants of certain facts concerning the operation of [a life insurance] policy"); Taylor v. United States, 89 F. Supp. 3d 766, 773 (E.D.N.C. 2014) ("[A] defendant's conduct in exercising perceived rights and remedies under a contractual agreement with another

party, even if allegedly contrary to the to the terms of the agreement, does not form the basis for a UDTPA claim.").

Here, multiple components to plaintiff's tort claims against defendant TLG are barred by the economic loss rule because they are not distinct from breach of contract, they arise in the course of contractual performance, and they properly are relegated to arena of contract law. In support of his UDTPA fraud, negligent misrepresentation, negligence, and civil conspiracy claims, plaintiff asserts defendants made misrepresentations or concealed material facts as follows:

1) "Defendants['] leads are generated in-house and are proprietary;"
2) "Defendants' Platinum leads provide TLG Agents with 90 days of exclusive access to retail customers;"
3) "the leads are older than Defendants claim;"
4) "Defendants' leads are sourced from third party vendors and are directly available to TLG Agents for cheaper prices through the third parties;"
5) "Defendants' marketing materials are false and misleading and are intended to deceive TLG agents about the true characteristics of the leads;"
6) "Defendants profit from the $199.00 access fees to monster.com and ziprecruiter.com."
7) "Defendants directly compete against TLG Agents in recruiting new agents and use TLG agents' access fees to finance such competition."

(Compl. ¶¶ 85, 95, 103, 108, 119, 127). Each of these asserted misrepresentations or concealed facts, however, are asserted as a basis for plaintiff's breach of contract claim arising under an implied duty of good faith and fair dealing. (Compl. ¶ 113). Moreover, each of the asserted misrepresentations or concealed facts arise in the course of the parties' "dealing in connection with their contractual duties and obligations." (Id.). Accordingly, they are properly addressed by a determination of whether defendant TLG "adequately fulfilled its contractual obligations." Strum, 15 F.3d at 330.

Plaintiff also asserts in support of his UDTPA claim that defendants "exercised their superior bargaining power to induce TLG Agents to enter into a one-sided and unconscionable contract of

adhesion." (Compl. ¶ 85(viii)). Such criticism of the Agent Agreement, however, more properly is addressed as a defense to a breach of contract claim or counterclaim, not as an independent tort claim. See Tillman v. Commercial Credit Loans, Inc., 362 N.C. 93, 102 (2008) ("[U]nconscionability is an affirmative defense, and the party asserting it has the burden of proof."). Because unconscionability must turn on, in part, "substantive unconscionability" and analysis of whether the contract includes "harsh, one-sided, and oppressive contract terms," id., this component of plaintiff's UDTPA claim also is subsumed within the interpretation of the Agent Agreement and the parties' rights and remedies thereunder. Accordingly, this remaining component of plaintiff's UDTPA claim also is barred by the economic loss rule.

Plaintiff argues, nonetheless, that fraud claims categorically are not covered by the economic loss rule, citing Bradley Woodcraft, Inc. v. Bodden, 795 S.E.2d 253, 259 (N.C. Ct. App. 2016), for the proposition that "a plaintiff may assert both claims." Bradley Woodcraft, Inc., however, is inapposite for two reasons. First, on the unqualified general proposition of law for which plaintiff cites it, Bradley Woodcraft, Inc. is in conflict with Broussard, which mandated dismissal of North Carolina fraud claims asserted in that case under the economic loss rule. See 155 F.3d at 346.

Second, the holding in Bradley Woodcraft, Inc. is distinguishable. There, the defendant counter-claimant asserted that the plaintiff "fraudulently represented to her that he was a licensed general contractor when he was not in order to induce Defendant to hire him to perform the renovations to her home" and that he "promised that he would complete the work when he had no intention of doing so." 795 S.E.2d at 256. Such fraud claim was independent of breach of contract, by virtue of fraudulent misrepresentation preceding contract formation and identified lack of present

intent to perform terms thereof. See Gadsden v. Johnson, 261 N.C. 743, 747 (1964) (stating that fraud may be alleged "where [a] promise is made fraudulently with no intention to carry it out").

Plaintiff argues that he has sufficiently alleged fraudulent misrepresentations and concealments "prior to the formation of the Agent Agreement," thus escaping the economic loss rule. (Pl's Resp. (DE 15) at 22). Likewise, plaintiff argues that tort claims asserted against defendant Leazer personally are not barred by the economic loss doctrine. As set forth above, however, all of the grounds asserted in the complaint for plaintiff's tort claims render such claims barred by the economic loss rule. To the extent plaintiff now suggests through his brief that he is asserting fraudulent misrepresentation or concealment claims based upon statements made to him prior to his entry into the Agent Agreement, the court addresses such assertions below in the next section of the analysis. Likewise, the court addresses further below plaintiff's assertion of tort claims against defendant Leazer personally.

In sum, plaintiff's tort claims on the grounds asserted in the complaint are barred by the economic loss rule and thus must be dismissed as a matter of law.

b.    Pleading Fraud with Specificity

Where plaintiff now asserts fraudulent misrepresentation or concealment claims against defendant TLG based upon statements made to him prior to his entry into the Agent Agreement, the court addresses as follows whether such claims are pleaded with requisite specificity.

To state a fraud claim under North Carolina law, a plaintiff must allege: "(1) [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party."

Forbis v. Neal, 361 N.C. 519, 526–27(2007) (quotations omitted). "Additionally, any reliance on the allegedly false representations must be reasonable." Id. at 527.

Federal Rule of Civil Procedure 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "[T]he 'circumstances' required to be pled with particularity under Rule 9(b) are "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 784 (4th Cir. 1999); see, e.g., Weidman v. Exxon Mobil Corp., 776 F.3d 214, 219 (4th Cir. 2015) (affirming dismissal of fraud claim where plaintiff "does not specify when or how many times the representations occurred"); Bakery & Confectionary Union & Indus. Int'l Pension Fund v. Just Born II, Inc., 888 F.3d 696, 705 (4th Cir. 2018) (affirming dismissal of fraud claim where plaintiff "did not specify who it was accusing of which specific misrepresentations").

Plaintiff argues that he has sufficiently pleaded a fraudulent misrepresentation claim on the basis of the allegation that "TLG and Leazer make numerous additional misrepresentations to prospective TLG Agents to induce them into joining TLG and to contractually obligate them to both purchase products and services from TLG and Leazer and to sell TLG's and Leazer's insurance products." (Pl's Resp. (DE 15) at 22 (quoting Compl. ¶ 31). He states: "For instance, TLG and Leazer induce prospective TLG Agents to join TLG by promising the opportunity of significant 'passive' income through the development of a stream of income from commission overrides on the earnings of down-line agents." (Compl. ¶ 32). Plaintiff also states that "in . . . marketing materials directed to Plaintiff and other prospective TLG Agents, TLG and Leazer promised '[f]resh, high quality direct mail leads! . . . [o]ur exclusive Mortgage Protection Platinum Direct Mail Lead

program is unique and enables our agents to yield a much higher ROI (rate of return) on their marketing investments than other lead sources.'" (Compl. ¶ 19).

Notably missing from plaintiff's complaint are any specific allegations as to what communications (allegedly fraudulent or otherwise) were made to plaintiff prior to his execution of the Agent Agreement on March 23, 2016. There is no allegation as to <u>who</u> made any such statements to plaintiff, <u>when</u> such statements were made, <u>what</u> were the specific contents of such statements, nor <u>where</u> such statements were made. Plaintiff's fraud claims based thereon must therefore be dismissed for failure to comply with the requirements of Federal Rule of Civil Procedure 9(b).

Moreover, with respect to the quoted "marketing materials directed to Plaintiff," (Compl. ¶ 19), plaintiff has not alleged any facts permitting an inference that such quoted marketing materials contain a "[f]alse representation or concealment of a material fact." <u>Forbis</u>, 361 N.C. at 526–27. Plaintiff alleges, for example, that "TLG's leads are neither generated in-house nor proprietary." (Compl. ¶ 20), but the quoted marketing materials do not promise "in-house" or "proprietary" leads. (<u>Id.</u> ¶ 19). Similarly, plaintiff alleges that leads "were not exclusive to TLG Agents," (<u>id.</u> ¶ 22), but the quoted marketing materials do not promise leads "exclusive to TLG Agents." (<u>Id.</u> ¶ 19). Finally, plaintiff alleges that defendants sold him leads "well into or even after the expiration of the 90-day term," (<u>id.</u> ¶ 24), but the quoted marketing materials do not promise leads within a 90-day term. (<u>Id.</u> ¶ 19). Thus, plaintiff fails to state a claim for fraud where there is a mismatch between, on the one hand, the specific statements plaintiff suggests were fraudulent and, on the other hand, what plaintiff alleges he was promised but did not receive.

In sum, plaintiff has not pleaded an independent fraudulent misrepresentation or concealment claim against defendant TLG with requisite specificity, and plaintiff has not pleaded facts permitting an inference of a false representation or concealment of a material fact. Therefore, in addition to being barred by the economic loss rule, plaintiff's tort claims against defendant TLG based upon fraudulent misrepresentation or concealment must be dismissed for failure to state a claim.

      c.      Tort Claims Against Defendant Leazer

Plaintiff suggests in his brief that he may assert tort claims against defendant Leazer without bar of the economic loss rule, where plaintiff does not assert a breach of contract claim against defendant Leazer. Plaintiff's tort claims, all of which are grounded in part in fraudulent misrepresentation or concealment, fail for lack of specificity in pleading in the manner described above with respect to defendant TLG. Moreover, with respect to defendant Leazer, plaintiff has failed to plead conduct by Leazer or any personal duty towards plaintiff to subject him to individual liability for torts asserted in the complaint. See Lillian Knitting Mills Co. v. Earle, 237 N.C. 97, 104 (1953). Nor does plaintiff plead facts sufficient to support piercing the corporate veil to attribute conduct of defendant TLG to defendant Leazer. See Green v. Freeman, 367 N.C. 136, 145 (2013). Accordingly, the court rejects plaintiff's assertion that statements or acts of defendant TLG are "one-and-the-same." (Pl's Resp. (DE 15) at 15).

Furthermore, plaintiff's claim of civil conspiracy against defendant Leazer fails because "acts of corporate agents are acts of the corporation itself, and corporate employees cannot conspire with each other or with the corporation." Godfredson v. JBC Legal Grp., P.C., 387 F. Supp. 2d 543, 550 (E.D.N.C. 2005) (quoting ePlus Technology, Inc., v. Aboud, 313 F.3d 166, 169 (4th Cir.2002)). While plaintiff suggests that this rule does not apply where corporate employee's "actions exceeded

the bounds of their authority," (Pl's Resp. (DE 15) at 23), plaintiff has not alleged facts permitting an inference that defendant Leazer's actions exceeded the bounds of his authority as an agent for defendant TLG.

In sum, plaintiff's tort claims against defendant Leazer must be dismissed for failure to state a claim upon which relief can be granted.

### 3. Unjust Enrichment

"The general rule of unjust enrichment is that where services are rendered and expenditures made by one party to or for the benefit of another, without an express contract to pay, the law will imply a promise to pay a fair compensation therefor." Krawiec v. Manly, 370 N.C. 602, 615 (2018). "In order to establish a claim for unjust enrichment, a party must have conferred a benefit on the other party, and the benefit must not be gratuitous and it must be measurable." Id. (quotations omitted). "A claim of this type is neither in tort nor contract but is described as a claim in quasi contract or a contract implied in law." Booe v. Shadrick, 322 N.C. 567, 570 (1988). Accordingly, "[i]f there is a contract between the parties the contract governs the claim and the law will not imply a contract." Id.

Here, plaintiff alleges that a "monetary payment was conferred upon Defendants by Plaintiff . . . for, among other things, leads and access to monster.com and ziprecruiter.com sub-accounts," and that plaintiff "did not receive the benefit of the bargain, in part, due to numerous misrepresentations and omissions made by Defendants to Plaintiff." (Compl. ¶ 116). Plaintiff's claim for unjust enrichment fails, however, because plaintiff does not allege conferring a benefit in absence of "an express contract to pay." Krawiec, 370 N.C. at 615. Rather, he expressly alleges the existence of a contract "which governs the business relationship between [plaintiff] and TLG," and

he attaches the contract to his complaint. (Compl. ¶ 44). Accordingly, where allegedly "there is a contract between the parties the contract governs the claim and the law will not imply a contract." Booe, 322 N.C. at 570.

Plaintiff argues that he may assert a claim for unjust enrichment in the alternative to a breach of contract claim. But, where plaintiff himself alleges the existence of a contract governing his relationship with TLG and attaches the contract to his complaint, plaintiff has not alleged facts upon which a plausible inference may be made of the absence of a contract between plaintiff and defendant TLG. Thus, under federal pleading rules, plaintiff has not stated facts sufficient to assert a claim of unjust enrichment, in the alternative or otherwise, against defendant TLG.

With respect to defendant Leazer, plaintiff has not pleaded facts giving rise to an inference that plaintiff conferred a benefit upon him as an individual. Indeed, plaintiff does not allege any interaction or communication between plaintiff and defendant Leazer. While plaintiff bases his unjust enrichment claim on "numerous misrepresentations and omissions made by Defendants to Plaintiff," (compl. ¶ 116), as discussed above, plaintiff does not allege any personal conduct by Leazer to plaintiff or from plaintiff to Leazer, to support a claim of unjust enrichment, or any other claim asserted, against Leazer.

Therefore, plaintiff's claim of unjust enrichment must be dismissed for failure to state a claim upon which relief can be granted.

4.      Declaratory Judgment, Punitive Damages, and Class Action Claims

Where plaintiff fails to state a claim upon which relief can be granted, plaintiff's claims for relief in the form of declaratory judgment, punitive damages, and putative class action claims necessarily must be dismissed.

5.      Dismissal Without Prejudice

Defendants seek dismissal of all claims with prejudice.  However, "unless the grounds for dismissal clearly indicate that no amendment in the complaint could cure the defects in the plaintiff's case," then dismissal without prejudice is required with opportunity for plaintiff to seek leave to amend. <u>See</u>  <u>Goode v. Cent. Virginia Legal Aid Soc'y, Inc.</u>, 807 F.3d 619, 623 (4th Cir. 2015); <u>see, e.g.</u>, <u>Hancock v. Americo Fin. Life & Annuity Ins. Co.</u>, 723 F. App'x 241, 242 (4th Cir. 2018) (dismissing appeal and remanding case for amendment of complaint, where district court dismissed breach of contract and tort claims for failure to plead sufficient facts in the complaint and due to economic loss rule).

Here, plaintiff's complaint must be dismissed without prejudice due to the economic loss rule and for failure to plead sufficient facts supporting plaintiff's claims.  As such, this order is not a final appealable order, and plaintiff must be given an opportunity to amend the complaint or to "stand on the complaint" as the circumstances may dictate.  <u>Goode</u>, 807 F.3d at 629.  Contrary to defendants' suggestion, the court cannot dismiss this action with prejudice at this time, where the grounds for dismissal are a "failure to plead sufficient facts" to support a claim and failure to plead an independent tort under the economic loss rule.  <u>See</u> <u>id.</u> at 624; <u>see</u> <u>Hancock</u>, 723 F. App'x at 242.

Accordingly, in the event plaintiff wishes to pursue his claims in this court, he must, within **21 days** of the date of this order, file a motion for leave to amend the complaint, accompanied by 1) a proposed amended complaint, 2) a redline showing differences between the proposed amended complaint and the original complaint, and 3) a memorandum in support thereof.  In the event plaintiff does not seek leave to amend in this manner in the time period specified, the clerk without further order of this court shall enter judgment closing the case based upon this order.

## CONCLUSION

Based on the foregoing, defendants' motion to dismiss is GRANTED. Plaintiff's complaint is DISMISSED WITHOUT PREJUDICE for failure to state a claim under Federal Rules of Civil Procedure 9(b) and 12(b)(6). Plaintiff is allowed **21 days** from the date of this order to file a motion for leave to amend complaint, in accordance with the requirements set forth herein. In the event plaintiff does not seek leave to amend in this manner in the time period specified, the clerk without further order of this court shall enter judgment closing the case based upon this order.

SO ORDERED, this the 18th day of March, 2019.


LOUISE W. FLANAGAN
United States District Judge